No. 48,770

In the Matter of the Estate of Robert Dean Shields, Deceased; MICHAEL B. SHIELDS, Administrator, and PATRICIA LYNN KNIGHT, *Appellees,* v. VICTORIA ANN SHIELDS, *Appellant.*

(584 P.2d 139)

Opinion filed September 14, 1978.

*Michael G. Coash,* of Bond, Bond & Coash, of El Dorado, argued the cause and was on the brief for appellant.

*James F. Richey,* of Rumsey & Richey, of Wichita, argued the cause and was on the brief for appellees.

*Amici Curiae* briefs were filed by *Robert D. Hecht* and *Robert E. Keeshan,* of Scott, Quinlan & Hecht, of Topeka; *Robert A. McClure* and *Michael W. Merriam,* of Colmery, McClure, Funk, Letourneau & Entz, of Topeka; and *Linda D. Elrod* and *John F. Kuether,* of Washburn University, of Topeka.

The opinion of the court was delivered by

HOLMES, J.: This case is before the court on a petition for review of a decision of the Court of Appeals. The original action in the trial court was for a determination of the distribution of the property of Robert Dean Shields, who died intestate of gunshot wounds inflicted by his wife, Victoria Ann Shields. Victoria was convicted of feloniously killing her husband. Victoria and Robert owned both real and personal property as joint tenants. The two children of the couple claim that by reason of K.S.A. 59-513, Victoria has no interest in any property in which Robert had an interest, including the property held in joint tenancy. Victoria claims she is the owner of one-half of the joint tenancy property and that if she is deprived of that ownership by K.S.A. 59-513, the statute contravenes Section 12 of the Bill of Rights of the Kansas Constitution.

The district court adopted the position of the children and held that Victoria succeeded to no interest in the joint tenancy property. The Court of Appeals reversed the judgment of the district court and held:

"When Victoria Shields murdered her husband and was subsequently con-

victed of second degree murder, the joint tenancy was severed and terminated and she became a tenant in common with the heirs of her husband. She retains an undivided one-half interest in the property. The lower court erred in depriving her of that interest." *In re Estate of Shields,* 1 Kan. App.2d 688, 694, 574 P.2d 229.

We have carefully reviewed the record, including excellent briefs of the parties and *amici curiae,* and adhere to the opinion of the Court of Appeals.

The decision of the Court of Appeals is affirmed, the decision of the district court is reversed and the case is remanded to the district court for further proceedings consistent with the views set forth in the opinion of the Court of Appeals.

McFARLAND, J., dissenting: England's Prime Minister Disraeli remarked that if a person loves the law or sausage, then he shouldn't watch either being made. This is all the more true when bad law is being made. I believe the majority opinion is making some bad law.

K.S.A. 59-513 clearly divests the surviving joint tenant of all interest in joint tenancy property upon conviction of the felonious slaying of the deceased joint tenant. The majority opinion concludes that this loss of interest in joint tenancy property is a forfeiture in contravention of Section 12 of the Bill of Rights of the Kansas Constitution. I strongly disagree.

"Forfeiture of estate" following a conviction is separate and apart from the term "forfeiture" as used in modern contract law. The majority opinion, in effect, makes the two terms synonymous. In order to understand the difference in the terms, it is necessary to trace the development in English common law of "forfeiture of estate." A somewhat oversimplified statement on the subject appears in 21 Am. Jur. 2d, Criminal Law § 616, p. 566, as follows:

"By the ancient common law, when sentence was pronounced for a capital offense, the offender, by operation of law, was placed in a state of attainder. Attainder of treason or felony had three principal incidents: forfeiture of property to the king; corruption of blood, which meant that neither could the attainted person transmit his estate to his heirs, nor could they inherit through him; and an extinction of civil rights, more or less complete, known as 'civil death.' Although a modified form of civil death exists by statute in some jurisdictions, the other common-law incidents are swept away under modern policies of the law. Corruption of blood and forfeiture on conviction are forbidden by the constitutions of some states. A convict sentenced for a term less than life may forfeit all public offices and private trusts, but his civil rights are only suspended during the term. He does not lose citizenship, but merely some of his rights and privileges as a

citizen. And many, though not all, of the latter, are automatically restored when the sentence has been served. . . ."

A rather comprehensive study of forfeiture of this matter appears in Reppy, "The Slayer's Bounty—History of Problem in Anglo-American Law," 19 N.Y.U.L.Q. Rev. 229 (1942), wherein it is stated:

"The first incident of an attainder, to wit, forfeiture of lands and chattels for a felony, was Anglo-Saxon in origin, constituting part of the punishment for the offense. It was a prerogative of the Crown. Under this doctrine the land and tenements and the goods and chattels of the attainted felon were forfeited to the King: the former, during the life of the offender, on the pronouncement of sentence, or of office found, the latter absolutely upon conviction.

"Corruption of blood, a second incident of attainder, was of feudal origin, being introduced into England after the Norman Conquest. Under this doctrine the blood of the attainted person was said to be corrupt, with the consequence that he could not convey his estate to his heirs, nor could they take by descent from him. In short, by this cruel doctrine, the felon's heirs unto the remotest generation were barred from inheritance.

"In this connection, it is well to remember that the doctrine of attainder and corruption of blood may have had something to do with the rule that the death of a human being cannot be the cause of a civil action. If this be true, it may also be true that the same rule may have had something to do with the rule that the murderer of an ancestor is debarred from inheriting land from the ancestor, as the conviction related back to the date of the commission of the crime, because the moment the forfeiture occurred, there was no longer any title in the wrongdoer to pass to his heir.

"In the case of chattels, however, the forfeiture was effective at once, if the felony was known. If there was an interval between the murder and its discovery, doubtless the chattels would have passed to the wrongdoer subject to forfeiture upon discovery and conviction. . . ." (pp. 232-233.)

There is little to be gained by tracing English law over the centuries to show how forfeiture of estate and corruption of blood were modified and, in some respects, made less harsh. However, it is interesting to note that the system of attainder with its accompanying forfeiture was a basic part of English law and was a difficult issue for compromise when England and Scotland were merged since these concepts were alien to the Scottish law. It is sufficient to say that gradually the list of offenses for which attainder applied was reduced and the effects thereof were softened. Forfeiture for all but high treason came to be for a given period of time, usually a year and a day. The Crown was specifically permitted to commit waste during forfeiture. In fact, the King, at one period of time, had the right to penalize felons by

deliberate waste such as pulling down their houses, destroying their gardens, cutting down their woods, etc. The basis for this harsh rule goes clear back to biblical days and was a part of Roman law.

It should be remembered that nationalism is a comparatively recent concept and in earlier times drastic measures were necessary to keep loosely knit kingdoms intact. The harsh measures of forfeiting, in essence, the rights of one's descendants, was valuable in maintaining loyalty to the government. As stated in 4 Blackstone, Commentaries *382:

"And therefore Aulus Cascellius, a Roman lawyer in the time of the triumvirate, used to boast that he had two reasons for despising the power of tyrants; his old age and his want of children: for children are pledges to the prince of the father's obedience. . . ."

In passing, it should be noted that an extensive discussion of attainder and forfeiture appears in the Blackstone Commentaries, but in the interest of brevity, this material is summarized. It is sufficient to say that the English continued to modify the severe effects of the doctrine with the passage of various laws. The list of crimes where forfeiture was allowed was reduced. But forfeiture remained until 1870 with the passage of the Forfeiture Act of 1870 (33 & 34 Vict., c. 23). Reppy, 19 N.Y.U.L.Q. Rev. at p. 244, traces the development of the doctrine in the United States as follows:

"In England, the common law doctrines of attainder, forfeiture, corruption of blood and escheat played a prominent part in the solution of the problem of the slayer and his bounty. Not having been abolished prior to the American Revolution, they became part of the colonial law. If these doctrines had not been expressly abrogated they would still remain in our law to complicate the problem of the slayer and his bounty in the United States. For the most part, however, we have been saved from this complication by constitutional and statutory abolishment of these undemocratic and archaic features of the common law.

"Thus, in 1789 the Federal Constitution led the way in providing: 'The Congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted.'

"Similar provision have been incorporated into some of our state constitutions. Generally, however, in other states the matter has been covered by statutory enactments providing that conviction of a felony shall not work a forfeiture or corruption of blood. . . ."

The time frame is important to be noted, then. In 1859 the Bill of Rights of the Kansas Constitution was enacted. Section 12 of the Bill of Rights provided:

"No person shall be transported from the state for any offense committed within the same, and no conviction within the state shall work a corruption of blood or forfeiture of estate."

In 1972 the Section was amended to delete the phrase "corruption of blood or." At the time the Bill of Rights was enacted, it is important to note that attainder with its accompanying forfeiture was a part of the common law applicable to the new state. The Federal Constitution prohibited forfeiture only in matters of treason. Therefore, the prohibition against corruption of blood and forfeiture of estate upon conviction performed the valuable services of eliminating from the common law of the state these harsh penalties and prohibiting any future revival of same. The fact that corruption of blood and forfeiture of estate were linked together in their abolition clearly shows the desire to eliminate two of the three parts of attainder, leaving only civil death.

The concept of a felon forfeiting everything he owns to the government as a penalty for his crime is so alien to modern jurisprudence that it is difficult to realize that it was a part of our law in comparatively recent times. Nevertheless, it is forfeiture of estate to the government as a fine or penalty that is forbidden by Section 12 of the Bill of Rights.

Taken in context of the time of its passage and the part of the common law which it was abolishing, it is clear that K.S.A. 59-513 is not in contravention of the constitutional prohibition. The statute in question does not authorize any forfeiture of the estate to the government upon conviction. Vestiges of the old common law have been enacted and have been upheld as far as in rem forfeitures of specific contraband items or instruments used in crimes.

37 C.J.S., Forfeitures § 1, pp. 4-5, states:

"Although, as appears in Fines § 1, the terms 'fine,' 'forfeiture,' and 'penalty' are often used loosely and even confusedly, the term 'forfeiture' has a distinct meaning. It is a comprehensive one and expresses the result which flows from a failure to comply with the law. The term is most generally used to signify the effect of transgression of a penal law rather than the transgression itself. Forfeiture as meaning the divestiture of property or estates or rights therein under contracts for breaches of private duties or obligations is treated in Contracts §§ 320, 406-411, and specific titles discussing particular estates, rights or contracts. As the term is used in this title, forfeiture is the divestiture of specific property without compensation, in consequence of some default or act forbidden by law. Within the scope of this title two types of forfeitures may be recognized:

(1) A common-law or judicial forfeiture. (2) A legislative or statutory in rem forfeiture. They are distinguished by the time when they take effect, see infra § 6, and also in that actions for a common-law or judicial type of forfeiture are in personam against a defendant, while suits for a legislative or statutory in rem forfeiture are in rem, not against the owner or possessor of the property, but against the property itself, which is treated as the real offender. Included under the first type is the forfeiture of specific property used by a person in the commission of, or in connection with the commission of, a crime of which he is convicted, which is enforced, under statutes expressly providing therefor, in an in personam proceeding, generally ancillary to a criminal prosecution, as a punishment for the crime of which accused is convicted. Also included under this type is the forfeiture, as a punishment for a person's conviction of a crime, of his goods and estate generally, a forfeiture which was common under the early law and included the theory of corruption of blood which cut off the heirs, but which is now generally abrogated . . . ."

The majority opinion confuses forfeiture to the government with forfeitures between private individuals in civil proceedings. The case before us is a civil action and the abolition of forfeiture of estate contained in the Bill of Rights is wholly inapplicable. In disputes between parties, such as the case at hand, one forfeits some right due to some act or omission on one's part. For example, failure to pay the contract price as specified can result in a forfeiture in the interest in land one is purchasing. By Kansas law, one spouse cannot will away from the other spouse more than one-half of his or her real estate without consent (K.S.A. 59-602). If the deceased does will away more than one-half of his or her real estate, the surviving spouse may elect to take under laws of intestate succession rather than by will. If the surviving spouse is convicted of feloniously slaying the deceased spouse, he or she "forfeits" his or her rights to inherit anything pursuant to K.S.A. 59-513. Likewise, under K.S.A. 59-513, a person convicted of feloniously slaying another "forfeits" all beneficiary rights to life insurance on the deceased regardless of the fact the slayer may have paid all premiums thereon. I see no distinction between these "forfeitures" of contract rights and those pertaining to joint tenancy.

The fact that a partition action could have been run on joint tenancy property during the lifetime of the joint tenants does not mean that the slayer has a vested interest in one-half of the property. The slayer has extinguished the deceased's option to partition the property. Death by any means other than at the hands of the other joint tenant divests the deceased of any interest in the jointly held property.

Under the majority opinion, a judge, in a divorce action, could award joint tenancy property to the wife at 5:00 p.m., and the husband could reacquire half of the property at 5:15 p.m. by killing the wife so long as the entry of judgment had not been made. The majority opinion, in essence, authorizes "out-of-court partition actions" maintained by the use of a gun. In joint tenancy, the survivor receives all. That is a part of the contract of the parties. K.S.A. 59-513 simply adds another condition. That is, if you survive, you inherit all providing you are not the survivor due to your own felonious act of taking the life of the other joint tenant. Little time needs to be spent on the proposition that it is in the best interest of public policy to discourage citizens of the state from killing other citizens of the state. That no man shall be permitted to profit by his own wrong is a basic tenet of our system of jurisprudence.

The major part of the majority opinion is concerned with what is "most equitable" to the slayer. I have great difficulty applying equity to the situation at hand. The property is not being divided by a partition action and cannot be because one joint tenant has killed the other. The legal maxims, that "to seek equity one must do equity," "clean hands," etc., seem outrageously inappropriate. Victoria Shields murdered her husband and now seeks equity? I cannot comprehend how she could be coming to the court with clean hands. One wonders what the majority will think is most "equitable" in a situation where the remainderman feloniously slays the life tenant.

The issue before the court is relatively simple. I believe that the Bill of Rights, for reasons heretofore stated, does not prohibit the legislature from divesting a surviving joint tenant of any interest in joint tenancy property when the death of the decedent was feloniously caused by the surviving joint tenant. The reason for such a law is well-founded in public policy. The legislature had the power to enact K.S.A. 59-513 and it is not for this court to question the wisdom of the legislature in so doing. The law can be supported amply on grounds of public policy. Granted, in some individual cases it may be harsh but that in no way affects its validity. All degrees of felonious killing, under the statute, are treated in the same manner. Therefore, premeditated murder is treated the same as involuntary manslaughter. The fact that the

result might be harsh in some cases does not invalidate the law. For example, take a "May-December" marriage. Usually, December has the money. Assume that May married December for the money and coldly, calculatedly, and premeditatedly murders December. The operation of the law is very fair and just. Suppose, on the other hand, that December finds out about the plan before it is perpetrated, argues with May in a drunken rage, and unintentionally kills her. December is then divested of all interest in joint tenancy property as a result of being convicted of involuntary manslaughter. December will then lose all interest in joint-tenancy property which was his alone prior to the marriage. The result is very harsh to December. No law or interpretation thereof can be fair in both circumstances. But it is not up to this court to determine the wisdom of legislation.

It is rather ironic that in the first Kansas case on the slayer's bounty issue, *McAllister v. Fair,* 72 Kan. 533, 84 Pac. 112 (1906), this court refused to disinherit a husband who killed his wife because the legislature had not provided authority for such action. The result of this decision was the first Kansas statute limiting the right of a convicted killer to inherit (L. 1907, ch. 193, § 1). In *Rosenberger v. Northwestern Mutual Life Ins. Co.,* 176 F. Supp. 379 (D. Kan. 1959), the history of K.S.A. 59-513 was considered and the court held that its enactment was a reaction to *McAllister,* stating:

"Obviously, the legislature intended to give force to the rule of the common law that no man shall be permitted to profit by his own wrongful act. . . ." (p. 382.)

In *Hamblin v. Marchant,* 103 Kan. 508, 175 Pac. 678 (1918), aff'd on rehearing, 104 Kan. 689, 180 Pac. 811 (1919), this court said of the statute:

"The statute is not penal; it does not add anything to the punishment of the person convicted; neither does it provide for a forfeiture; and nothing is taken from the person convicted. . . ." (103 Kan. at 510.)

In *In re Estate of Foster,* 182 Kan. 315, 320 P.2d 855 (1958), the joint tenant husband was convicted of a felonious killing of his wife. The statute in effect at the time stated:

"No person who shall be convicted of feloniously killing, or procuring the killing of, another person shall inherit or take by will or otherwise from such other person any portion of his estate." (G.S. 1949, 59-513.)

The court found that because joint tenancy property passed as of the moment of death and was not a part of the estate, the statute was inapplicable. The language of the case is particularly interesting, as follows:

"By the enactment of 1907, heretofore referred to, and the 1939 statute now under consideration, the legislature has pre-empted the field and subject matter, and, as previously pointed out, in neither of those statutes, nor in those . . . relating to the creation, or termination by death, of joint tenancies, has the legislature seen fit to limit or restrict the right of a *surviving joint tenant* in property so held, because of criminal conduct on his part.

"Although a theory depriving a murderer of *any benefits* resulting from his crime appeals to our sense of justice and equity, we are not permitted to read something into the statute which is not there. The result is that upon the death of his wife the husband succeeded to the entire interest in the property in question." (p. 322.)

*In re Estate of Pyke,* 199 Kan. 1, 427 P.2d 67 (1967), involved a murder-suicide factual situation. Obviously, in such circumstances, no conviction is possible. The apparent slayer received the property. This court held:

"As said in the McAllister and Foster cases, *supra,* it is abhorrent to the mind of every right-thinking person that one should receive property as a result of his crime, yet running through all of our cases are the positive statements that the public policy of this state is founded in the Constitution and the statutory enactments, and that this court is not warranted in reading into the plain statutory provisions an exception which those statutes themselves in no way suggest, or in holding they mean something else merely because the result under the particular circumstances leaves something to be desired." (p. 14.)

The majority finds that the legislature responded to the results of *Foster* and *Pyke* when it enacted the present K.S.A. 59-513 which prohibits the taking of any interest in joint tenancy property by a joint tenant convicted of slaying the deceased joint tenant and which brings the murder-suicide situation into the simultaneous death provisions of K.S.A. 58-701 to 58-705, inclusive. It is ironic that, in *Foster,* this court said it could not divest a surviving joint tenant of interest in the property because the legislature had pre-empted the field and had not enacted a statute to that effect. The legislature then enacted precisely such a statute. Now the majority holds the legislature could not enact such a statute because it is violative of the Bill of Rights.

The language of K.S.A. 59-513 is clear and it does not violate Section 12 of the Bill of Rights.

I would reverse the Court of Appeals and affirm the district court.